OPINION OF THE COURT
Harold Baer, Jr., J.
These pretrial motions on behalf of all defendants are consolidated for purposes of disposition. Defendants move to suppress *666 their Grand Jury testimony as the product of illegal electronic surveillance and dismiss the indictments against each. Alternatively, they seek dismissal of multiplicitous counts and transfer of this case to a Justice of the Supreme Court other than the Honorable Harold S. Rothwax. This last request has been granted.
Defendants Louis Casalini and Peter De Lutro are each charged with two violations of criminal contempt in the first degree, Penal Law § 215.51. Albert Palmieri, Accursio Licata and Anthony Grieco are each charged with three violations of that same statute.
On June 2, 1983, New York County District Attorney Robert M. Morgenthau applied to the Supreme Court, New York County, for a warrant to eavesdrop over a telephone located on the second floor of 167 Mulberry Street. The application requested authorization to intercept gambling-related communications by persons whose identities were unknown at that time. Justice Shirley R. Levittan granted the application and issued the warrant on June 2, 1983. Subsequently, on June 30, 1983, this eavesdropping warrant was extended by order of Justice Levittan for another 30 days, identifying as persons whose communications were expected to be intercepted, Casalini, De Lutro and Palmieri.
In the interim, Justice Levittan issued, on June 22, 1983, a second eavesdropping warrant, authorizing the installation of a “bug” in the Andrea Doria Social Club located on the first floor of 167 Mulberry Street, and also in the rear courtyard of the club. The June 22nd warrant also identified Casalini, Palmieri and De Lutro.
Finally, on August 4,1983, Justice Harold S. Rothwax issued an eavesdropping warrant permitting interception of telephone conversations over a telephone located in the Andrea Doria. No request for an extension was made, but on December 1,1983, the People sought and obtained an order from Justice Levittan, permitting postponement of the notice required to be given to Casalini, De Lutro and Palmieri pursuant to CPL 700.50 (3), (4). On December 6,1983, four defendants were served with subpoenas to appear before the Grand Jury on December 21, 1983; Grieco was served on December 7 to appear on December 20, 1983. On December 7, 1983, Casalini, De Lutro, Palmieri and Grieco were served with notices of eavesdropping. Defendant Licata was not served because he was not intercepted.[1]
*667 After a number of adjournments, each defendant appeared before the Grand Jury. They were not asked to sign a waiver of immunity. Each proceeded to read a prepared statement declaring that he would refuse to answer any questions on the ground that they were the product of illegal electronic surveillance. Following the reading of the statement, each refused to answer any further questions; Defendant Grieco also refused to answer, asserting, as an additional ground, his 5th Amendment privilege. The instant indictments for criminal contempt in the first degree followed.
I
Turning first to the motion to suppress, a witness before the Grand Jury may refuse to answer questions derived from information obtained through an illegal wiretap and the contempt power may not be used to compel such testimony or to punish the witness for his silence. (People v McGrath, 46 NY2d 12.) If the wiretap was illegal, the motion to suppress must generally be granted and the indictment dismissed. (Supra.)[2]
Defendants urge several grounds for finding the electronic surveillance tainted with illegality: first, that the initial June 2, 1983 application for a wiretap violated the naming provision of GPL 700.30 in that although Casalini, De Lutro and Palmieri were known to be committing offenses and would, therefore, be using the telephone, their names were not mentioned in the warrant. CPL 700.30 provides, in part:
“An eavesdropping warrant must contain * * *
“2. The identity of the person, if known, whose communications are to be intercepted”.
The District Attorney contends that the governing standard was reiterated by the Supreme Court in United States v Donovan (429 US 413, 423): The People are “not required to identify an individual in the application unless it has probable cause to believe (i) that the individual is engaged in the criminal activity under investigation and (ii) that the individual’s conversations will be intercepted over the target telephone.”
As of June 2, 1983, the People assert that although they had probable cause to believe Casalini, De Lutro and Palmieri were engaged in criminal activity, they lacked such cause to believe *668 that their conversations would be intercepted. The warrant authorizing the first wiretap was, therefore, valid insofar as it authorized interception of communications of persons whose identities were unknown at that time.
While Casalini, De Lutro and Palmieri were identified in the application as implicated in the crimes under investigation, they are not identified as using the telephone sought to be tapped. The defendants contend that the prosecutor had probable cause to believe that they would be overheard.
Assuming, arguendo, there was a requirement and a failure to name these defendants in the June 2, 1983 warrant, although they were named in the application, does such a deficiency compel suppression? I think not. While the better practice under the circumstances of this case may have been to put the names in the warrant, failure to do so does not invalidate the warrant.
While, as the defense points out, the requirements of CPL article 700 must be strictly construed, that article reflects and follows controlling Federal law. (People v Sher, 38 NY2d 600.) Under Federal law, the Supreme Court in United States v Donovan (supra) has held that the failure to identify in a wiretap order all persons who are likely to be overheard engaging in incriminating conversations will not invalidate an otherwise lawful judicial authorization. (429 US, at p 435.)
Moreover, the defendants have demonstrated no prejudice stemming from the failure to identify them in the warrant as persons whose conversations were to be intercepted, where they were identified in the application. The applications were full and fair disclosures of the information in possession of the People at that time. Indeed, the defense does not contest the adequacy of the application. (See, CPL 700.20.)
Second, another purpose for the naming provision is to provide a basis for notifying persons of the wiretap after it has been terminated. Since CPL 700.50 provides that the court, in its discretion, may require notification of parties not named in the warrant, but whose communications were intercepted, there is minimal potential for a failure to notify where the persons are identified in the application, albeit not in the warrant.
In People v Watkins (63 AD2d 1033, cert denied 439 US 984), the court held that even though there was the possibility that conversations involving at least one of the defendants would be' intercepted, the failure to identify any defendant in the eavesdropping warrant did not mandate suppression. The language of that appellate court is instructive: “[TJhere is no proof that the *669 authorities, at the time they applied for the warrant, (1) knew or suspected that they would intercept conversations between the defendants or (2) withheld the names of the defendants from the court so that it could not prevent them from intercepting arguably privileged exchanges. There is no reason to believe that the inclusion of the names of the defendants would have caused the court to reject the application for the warrant.” (Supra, at p 1034.)
Similarly, there is not proof in the instant case that the defendants’ names — included in the application — were withheld from the warrant so as to permit privileged communications to be intercepted.
Finally, defendants argue that, notwithstanding CPL article 700, the State Constitution, article I, § 12 prohibits a warrant that fails to identify persons whose communications are to be intercepted.[3] The People argue that the naming requirement of the State Constitution is irrelevant given the fact that the District Attorney cannot name unidentified persons. This position, while a statement of good law, hardly explains how the application can identify the defendants, place them in the context of a gambling operation, seek a telephonic eavesdropping warrant and claim the defendants were “unidentified persons.”
However, close reading of article I, § 12 requires that the application — not the warrant — identify the persons whose communications are to be intercepted. Since, adopting the defense view of the facts, the application for the June 2, 1983 warrant identified the defendants, the requirements of the State Constitution have indeed been satisfied.
With respect to Grieco, there is no evidence from which the court can conclude that the prosecutor was aware of Grieco’s identity until after the warrants had terminated, and his name need not have been included in the warrants or applications. While the daily plant reports (June 3 to June 9, 1983) contain numerous references to an “Anthony,” nowhere does the surname appear and the majority of conversations indicate that “Anthony” called from outside the location of the tapped phone, further inhibiting identification by the police. Moreover, Grieco was served with notice of eavesdropping on December 7, 1983.
*670 The second ground asserted in support of the motion to suppress is that the June 2, 1983 warrant should have been amended so as to name the defendants as targets of the electronic surveillance. (CPL 700.65 [4].) However, no amendment is necessary when, as here, the conversations are what were sought in the warrant. (People v Gnozzo, 31 NY2d 134, cert denied sub nom. Zorn v New York, 410 US 943.)
Finally, the remaining grounds for the motion to suppress are likewise without merit. There is no evidence that jthe statement in the application for the warrants that normal investigative procedures would be inadequate was unreasonable.
Likewise, there is no proof of abuse of the People’s request to extend the time to serve notice of wiretaps after termination; nor does there appear to have been a “contempt” trap to snare the defendants. The defense contends that but for such a trap, the defendants would not have been summoned before the Grand Jury. They reason that since the affidavits in support of the warrants claim eavesdropping was necessary and, further, that without such tactics, witnesses called by the People would likely lie before the Grand Jury, then the People knew they would obtain no information from these defendants when they appeared before that tribunal. Such reasoning is flawed. The District Attorney could reasonably believe that, armed with eavesdropping evidence, he could convince an otherwise uncooperative witness to testify truthfully before the Grand Jury in December 1983.
II
Turning to defendants’ alternative request to dismiss as multiplicitous the second and third counts of contempt as to Licata, Palmieri and Grieco, and the second count as to Casalini and De Lutro, defendants urge that only a single act of contempt may be charged because they prefaced their Grand Jury testimony with a statement that they would refuse to answer any questions based on their belief that the illegal electronic surveillance was the basis for the questions to be asked and that all questions asked related to the same investigation.
It is now well settled in both Federal courts and the courts of this State that once a witness has made his position clear that he will not answer any questions, the prosecutor cannot multiply the contempts, and possibly the punishment, by simply continuing to ask questions on the same subject matter and each time eliciting the answer that he refuses to answer any questions. (People v Chestnut, 26 NY2d 481; People v De Martino, 71 AD2d 477; United States v Costello, 198 F2d 200, 204.)
*671 The People contend, that there were two or three subjects of investigation before the Grand Jury — amongst them, gambling and usury — and that they were free to inquire into each to learn whether or not the witness would respond. Accordingly, refusals in each of these subject areas gave rise to several acts of contempt. While the People’s theory accurately states the law, each case must turn on its particular facts and circumstances. (See, People v Saperstein, 2 NY2d 210, cert denied 353 US 946.) In the instant case, the prosecutor’s own statements, as reflected in the Grand Jury minutes, make clear there was but one subject of investigation: the promotion of gambling, the possession of gambling records and conspiracy to commit these crimes. Usury was never a separate subject, but simply an area integrated into the gambling investigation. As such, it cannot retroactively support a separate count of contempt.
Similarly, questions addressed to whether or not each defendant was acquainted with certain individuals may not serve as the foundation for a separate count of contempt. A review of the types of questions held multiplicitous in the cases will shed some light on this issue.
People v Riela (7 NY2d 571, cert denied 364 US 915) arose out of the Grand Jury’s investigation of an upstate meeting of organized crime figures — better known as the Apalachin meeting. Riela was called before a Grand Jury and asked whether he knew Joseph Barbara, Sr., Frank Zito, James Colletti and whether Riela attended the meeting at Barbara’s home. Each refusal to answer these questions, and others, resulted in a separate count of contempt; 17 in all. The Court of Appeals held that a witness’ statement, after being granted immunity, that he would not answer questions about the Apalachin meeting, constituted a single crime of contempt, regardless of the number of questions put to him.
In People v Chestnut (supra), the People argued that separate topics of inquiry, albeit involving a common subject, give rise to separate contempts. For example, although a witness refused to answer whether he met with A and B in July 1964, he might answer whether he met separately with B alone, where B told him about instigating riots. The Court of Appeals, citing People v Riela (supra), reiterated that the witness, having made clear at the outset of his Grand Jury testimony that he would refuse to answer any questions concerning the alleged conspiracy, was subject to a single count of contempt, regardless of the number of questions he refused to answer. (26 NY2d, at p 492.)
*672 Accordingly, the second count of the indictments against Casalini and De Lutro, and the second and third counts of the indictments against Palmieri, Licata and Grieco, are dismissed and the interrogatories contained in each of the dismissed counts are consolidated so as to charge one count of contempt as to each defendant.

. Counsel have agreed to litigate this motion to suppress with respect to Casalini, De Lutro and Palmieri with the understanding that if, upon listening *667 to the tapes, it is established that Licata was overheard, he will also be allowed to press the claim of illegality.

. I find that Grieco preserved his right to challenge the legality of the wiretaps by his statement before the Grand Jury of his reasons for refusing to answer any questions and his reaffirmance of that statement during the questioning.

. NY Constitution, article I, § 12 provides, in part: “The right of the people to be secure against unreasonable interception of telephone and telegraph communications shall not be violated, and ex parte orders or warrants shall issue only upon oath or affirmation that there is reasonable ground to believe that evidence of crime may be thus obtained, and identifying the particular means of communication, and particularly describing the person or persons whose communications are to be intercepted and the purpose thereof.”